Slip Op. 11-21

## UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————————————— :
                                                               :
CALGON CARBON CORPORATION, AND        :
NORIT AMERICAS INC.,                                  :
                                                               :
            Plaintiffs,                                        :
                                                               :
        and                                                    :
                                                               :
HEBEI FOREIGN TRADE AND ADVERTISING :
CORPORATION,                                              :
                                                               :
            Consolidated Plaintiff,                    :
                                                               :
        v.                                                      :        Before: Jane A. Restani, Judge
                                                               :
UNITED STATES,                                           :        Consol. Court No. 09-00518
                                                               :
            Defendant,                                       :
                                                               :
        and                                                    :
                                                               :
JACOBI CARBONS AB, JACOBI CARBONS,  :
INC., CHERISHMET INC., BEIJING PACIFIC :
ACTIVATED CARBON PRODUCTS             :
COMPANY, LTD., NINGXIA GUANGHUA      :
CHERISHMET ACTIVATED CARBON          :
COMPANY, LTD., DATONG YUNGUANG       :
CHEMICALS PLANT, AND DATONG           :
MUNICIPAL YUNGUANG ACTIVATED         :
CARBON CO.,                                                :
                                                               :
            Intervenor Defendants.                    :
—————————————————————————————— :


## OPINION AND ORDER

[In antidumping duty matter plaintiffs' motion for judgment on the agency record denied. Consolidated plaintiff's motion for judgment on the agency record granted. Intervenor defendants' motion for judgment on the agency record granted in part and denied in part.

Commerce's request for voluntary remand granted.]

Dated: February 17, 2011

Kelley Drye & Warren LLP (R. Alan Luberda, David A. Hartquist, and John M. Herrmann, II) for the plaintiffs, Calgon Carbon Corporation and Norit Americas, Inc.

Mowry & Grimson, PLLC (Kristin H. Mowry, Jill A. Cramer, Jeffrey S. Grimson, Sarah M. Wyss, and Susan E. Lehman) for the consolidated plaintiff, Hebei Foreign Trade and Advertising Company.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Delisa M. Sanchez and Antonia R. Soares); Thomas M. Beline, Office of Chief Counsel for Import Administrative, U.S. Department of Commerce, of counsel, for the defendant.

Winston & Strawn, LLP (Daniel L. Porter, Ross E. Bidlingmaier, and William H. Barringer) for intervenor defendants, Jacobi Carbons AB and Jacobi Carbons, Inc.

Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP (Francis J. Sailer, Mark E. Pardo, Nikolas E. Takacs, and Andrew T. Schutz) for intervenor defendants, Cherishmet Inc., Beijing Pacific Activated Carbon Products Company, Ltd., Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd., Datong Yunguang Chemicals Plant, and Datong Municipal Yunguang Activated Carbon Co.

Restani, Judge: This action challenges the Department of Commerce's

("Commerce") final determination rendered in an antidumping ("AD") duty review of certain

activated carbon from the People's Republic of China ("PRC"). First Administrative Review of

Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping

Duty Administrative Review, 74 Fed. Reg. 57,995 (Dep't Commerce Nov. 10, 2009) ("Final

Results"); Certain Activated Carbon from the People's Republic of China: Amended Final

Results of Antidumping Duty Administrative Review, 74 Fed. Reg. 66,952 (Dep't Commerce

Dec. 17, 2009) ("Amended Final Results"). Plaintiffs Calgon Carbon Corporation and Norit

Americas Inc. (collectively "Calgon"), consolidated plaintiff Hebei Foreign Trade and

Advertising Corporation ("Hebei Foreign"), and intervenor defendants Cherishmet Inc., Beijing

Pacific Activated Carbon Products, Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon

Co., Ltd., Datong Yunguang Chemicals Plant, and Datong Municipal Yunguang Activated

Carbon Co. ("Cherishmet") sought judgment on the agency record pursuant to USCIT R. 56.2.

For the reasons stated below, the court sustains Commerce's final determination in part and

denies it in part and, accordingly, Hebei Foreign's motion for judgment on the agency record is

granted, Cherishmet's motion for judgment on the agency record is granted in part and denied in

part, and Calgon's motion for judgment on the agency record is denied.  Commerce's request for

voluntary remand is granted.

## BACKGROUND

In April 2007, Commerce published an AD duty order on certain activated carbon[1]

from the PRC.  Notice of Antidumping Duty Order: Certain Activated Carbon From the People's

Republic of China, 72 Fed. Reg. 20,988 (Dep't Commerce Apr. 27, 2007).  In April 2008,

Calgon requested an administrative review of ninety Chinese exporters and producers of

activated carbon.  App. to Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. Filed on

Behalf of Calgon Carbon Corp. and Norit Am.'s Inc. ("Pl.'s App.") Tab 12.  In June 2008,

Commerce initiated the first administrative review, for the period from October 11, 2006 through

March 31, 2008.  Initiation of Antidumping and Countervailing Duty Admin. Rev. and Requests

---

[1] Activated carbon is a powdered, granular, or pelletized carbon product obtained by activating with heat, chemicals, or steam various materials containing carbon, such as wood, coal, or petroleum pitch.  Activated carbon is produced through either physical or chemical activation.  With physical activation, the material with carbon content is exposed to high temperatures then activated through steam, oxygen, or carbon monoxide.  With chemical activation, the raw material with carbon is imbued with chemicals (typically phosphoric acid, potassium hydroxide) then carbonized at lower temperatures.

for Revocation in Part, 73 Fed. Reg. 31,813 (Dep't Commerce June 4, 2008) ("Initiation").

Commerce selected Jacobi Carbons AB ("Jacobi"), Calgon Carbon (Tianjin) Co. Ltd.[2] ("CCT"), and Jilin Bright Future Chemicals Co., Ltd. ("Jilin") as mandatory respondents. App. to Def.'s Resp. in Opp. to Pl.'s Mot. for J. upon the Agency R. ("Def.'s App.") Tab 1. Commerce selected Cherishmet as a mandatory respondent because Jilin refused to participate and Cherishmet had requested treatment as a voluntary respondent.  Def.'s App. Tab 3.  In November 2009, Commerce published the Final Results and Amended Final Results, assigning AD duty margins of 14.51% to CCT, 18.19% to Jacobi, and 16.84% for Cherishmet.  Amended Final Results, 74 Fed. Reg. at 66,953.  Commerce also revoked Hebei Foreign's separate rate and assigned Hebei Foreign the PRC-wide rate of 228.11%.  Issues and Decision Memorandum for the Final Results of the Antidumping Duty Admin. Rev. of Certain Activated Carbon from the People's Republic of China, A-570-904, POR 10/1106  3/31/08, at 78  81 (Nov. 3 2009) ("Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/prc/E9-27083-1.pdf (last visited Feb. 17, 2011).  In the Final Results, Commerce made determinations relating to separate rate certification, assignment of an adverse facts available rate, combination rates and zeroing as well as with regard to valuation of steam/energy coal, hydrochloric acid, carbonized material, bituminous coal, coal tar, ink, and labor.  In May 2010, Calgon, Hebei Foreign, and Cherishmet filed motions for judgment on the agency record under USCIT R. 56.2 as to these determinations.

---

[2] CCT, a subsidiary of Calgon, is a respondent which is not contesting the rate assigned to it by Commerce.  Calgon, the U.S. parent company of CCT, is one of the Petitioners.  Issues and Decision Memorandum at 3 n.2, 3 n.3.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's final determinations in AD duty reviews unless they are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.      **Hebei Foreign's Separate Rate Certification and Adverse Facts Available Rate**

Hebei Foreign alleges that Commerce erred in revoking Hebei Foreign's separate

rate status when Commerce determined Hebei Foreign's documents were improperly certified by

an individual who was later determined not to be an employee of Hebei Foreign.  Mem. of P. &

A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Hebei Foreign Trade and

Advertising Corp. ("Consol. Pl.'s Br.") 27.

In the Preliminary Results, Commerce granted Hebei Foreign's separate rate status

based on documents certified by Mr. Wang Kezheng.  Certain Activated Carbon From the

People's Republic of China: Notice of Preliminary Results of the Antidumping Duty

Administrative Review and Extension of Time Limits for the Final Results, 74 Fed. Reg. 21,317,

21,323  24 (Dep't Commerce May 7, 2009) ("Preliminary Results"); App. to Mem. of P. & A. in

Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Hebei Foreign Trade and Advertising

Corp. ("Consol. Pl.'s App.") Tab 10.  Commerce then placed a series of documents on the record

from Hebei Foreign's request for Changed Circumstances Review ("CCR"), a separate

administrative proceeding.  Consol. Pl.'s App. Tab 11.  In rescinding the CCR, Commerce noted

that:

Hebei Foreign's submissions and questionnaire response were certified by Wang

Kezheng as the manager of the No. 1 Business Department of Hebei Foreign.  However, Hebei Foreign's supplemental response clearly states that Wang Kezheng is not employed by Hebei Foreign.  The Department is mindful of the concerns raised by Petitioners with regard to Hebei Foreign's certification.  Accordingly, the Department reminds parties of their obligation pursuant to 19 CFR 351.303(g) to certify factual information submitted to the Department.

Id. at Tab 11, at Attachment 2 at 5 (footnotes omitted).  The relevant portions of Hebei Foreign's

response to the questionnaire state that "Mr. Wang Kezheng . . . is the manager of No. 1 Business

Department of Hebei Foreign," "Mr. Wang Kezheng and Jiang Hua are not working at Hebei

Foreign," "At the time of the submission of the CCR request, Mr. Wang Kezheng was employed

by Hebei Foreign," "Mr. Wang Kezheng joined Hebei Foreign as a sales manager in 2002 . . .

[and now] he serves as the manager of No. 1 Business Department," and "Mr. Wang Kezheng

does not hold any positions at other companies while he is employed at Hebei Foreign."[3]  Id. at

---

[3] Hebei Foreign's responses were prompted by two questions.  The first prompt reads: "On page 5 of your CCR request you stated that Hebei Foreign only had one U.S. customer who will continue to be supplied by Hebei Shenglun upon receipt of separate rate status.  In Exhibit 16 you submitted emails that you stated were from Hebei Foreign to the U.S. customer explaining the transition in companies and the need for the changed circumstances review.  However, it is unclear from the email print-outs who they are written by and to whom they are sent.  Please provide an explanation of the following names and email addresses, including the company represented by each individual and their position in the company: WKZ <activatedcarbon@active-carbon.com>."  Commerce then listed the e-mail addresses of two additional individuals unrelated to Mr. Wang's status."  Consol. Pl.'s App. Tab 11, at Attachment 6 at 6.

The second prompt reads, "On the certification page of your CCR request the submission is certified by Wang Kezheng, sales manager.  The certification states that he is "currently employed" by Hebei Foreign. A. Please provided an explanation for the term "currently employed" and state whether Wang Kezheng is still employed by Hebei Foreign.  Please provide a list of all position that have been held by Wang Kezheng at Hebei Foreign. B. Please provide a list of position held by Weng Kenzhang [sic] at any company other than Hebei Foreign while he was employed at Hebei Foreign. Specifically, please state whether Wang Kenzheng [sic] is or has been employed by Baoding Activated Carbon Factoy [sic] and what position he held if applicable."  Consol. Pl.'s App. Tab 11, at Attachment 6 at 6  7

Tab 11, at Attachment 6 at 6  7.  In the <u>Final Results</u>, Commerce found that:

> [The] Department placed information on the record which shows evidence that Hebei
> Foreign's separate rate status was based on incorrect information, resulting in the
> revocation of Hebei Foreign's separate rate. Hebei Foreign has not submitted any
> information to contradict the evidence on the record. Thus, we have assigned Hebei
> Foreign the PRC-wide entity rate of 228.11 percent.

<u>Final Results</u>, 74 Fed. Reg. at 57,998.  Hebei Foreign, however, did not have the opportunity to

place contradictory information on the record because the denial of separate rate status occurred

for the first time in the <u>Final Results</u>.[4]  In response to the <u>Final Results</u>, Hebei Foreign requested

a correction of ministerial errors on the basis that the relevant portion of their response to the

supplemental questionnaire:

> . . . was not written by Hebei Foreign as part of its response and was not intended for
> submission to the Department. The note was written by counsel's Chinese consultant
> noting his particular concern that certain emails written by Wang Kezheng to the U.S.
> customer could be interpreted as implying that Wang Kezheng was a commission agent
> of Hebei Foreign, rather than as an actual employee of Hebei Foreign.  The truth is,
> however, Mr. Wang has been authorized to make sales on behalf of Hebei Foreign since
> 2002 and he has signed many contracts on behalf of the company, several of which are on
> record.  He has therefore always been considered an "employee" of the company.

Consol. Pl.'s App.'s Br. Tab 14 at 4  5 (also citing contracts, organizational charts, and

presentations on the record showing Mr. Wang as an employee).  Commerce refused to make any

---

[4] The Government alleges that Hebei Foreign waived its claim because it failed to exhaust
its administrative remedies.  Def.'s Resp. in Opp. to Pl.'s Mot. for J. upon the Agency R. at 42
("Def.'s Br.").  The court may permit a party to raise an issue that it did not brief at the
administrative level if Commerce did not address the issue until its final determination.  <u>LTV
Steel Co. v. United States</u>, 985 F. Supp. 95, 120 (CIT 1997); <u>Qingdao Taifa Group Co. v. United
States</u>, 637 F. Supp. 2d 1231, 1237 (CIT 2009) ("<u>Taifa II</u>") (respondent is "not required to predict
that Commerce would accept other parties' arguments and change its decision"); <u>Saha Thai Steel
Pipe Co. v. United States</u>, 828 F. Supp. 57, 59-60 (CIT 1993) (respondent not required to file a
brief to exhaust its administrative remedies where it had "received all the remedy it sought from
the preliminary determination").  Because Commerce did not raise the issue prior to the <u>Final
Results</u> and Hebei Foreign did not have a full and fair opportunity to raise the issue at the
administrative level, Hebei Foreign may bring its claim before the court.

changes to Hebei Foreign's status.  Id. at Tab 15 at 8.[5]

      Here, the record indicates that Mr. Wang performed significant operations for the company and was likely in a position to supply the information Commerce requested.  In the regulation governing certifications, Commerce requires factual submissions to be certified and requires the certifier to specify the party by whom the certified is currently employed.  19 C.F.R. § 351.303(g).  Commerce appears to have construed its regulation to require, also, that the certifier be a current employee of the entity on whose behalf the certification is made, even though the regulation does not expressly state such a requirement.  Id.  If Commerce chooses to require formal employee status, Commerce must first make clear to respondents such a strict interpretation of its regulation.

      Furthermore, Commerce did not articulate how the statements on record as a whole support its finding that Mr. Wang was not a formal employee: Reliance on a single unclear statement by a party outside the respondent corporation to the exclusion of half a dozen others to the contrary does not rise to the level of substantial support.  The statements relied on by

---

[5] Commerce also failed to properly notify Hebei Foreign regarding the deficiency of its separate rate certification.  At oral argument, the Government contended that because the separate rate certification is a voluntary process, Commerce did not need to inform Hebei Foreign that it was rejecting its separate rate certification prior to the Final Results.  If the submission was mandatory, Commerce was required to "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."  19 U.S.C. § 1677m(d).  If the submission was voluntary, Commerce was required "to the extent practicable, provide to the person submitting the information a written explanation of the reasons for not accepting the information."  19 U.S.C. § 1677m(f).  The latter provision implies notice beyond the Final Results.  Because of the presumption of state control employed by Commerce, fair process requires that Commerce make substantial efforts to keep respondents fully informed on this crucial step.  In either case, Commerce did not fulfill its obligation under the statute, which required Commerce to provide Hebei Foreign with some explanation and an opportunity to respond.

Commerce are linguistically and contextually incoherent, demanding further explanation.  Thus,

Commerce failed to provide substantial support and this issue is remanded to Commerce so that

Commerce may explain its regulation in the context of Chinese corporations and determine

whether or not Mr. Wang was in a position to certify the facts at issue.  If Mr. Wang was in a

position to know the facts but was not an employee in the sense required by Commerce, then

Commerce must re-open the record to allow Hebei Foreign to attempt to find someone who

fulfills the regulatory requirement.[6]

## II.     Normal Value[7]

Calgon alleges deficiencies in Commerce's surrogate value calculations with

respect to A) energy/steam coal, and B) hydrochloric acid.  Cherishmet alleges errors by

Commerce with respect to hydrochloric acid as well as, C) carbonized material, D) bituminous

coal, E) coal tar, F) ink, and F) labor.  The court remands to Commerce for redetermination on

the surrogate value of hydrochloric acid, carbonized material, bituminous coal, and as requested,

its labor regression methodology.

### A.     Energy/Steam Coal

Calgon alleges Commerce did not provide substantial support for the reliability of

---

[6] Having found that Commerce improperly rescinded Hebei Foreign's separate rate status, the court need not consider the issues concerning the application of the PRC-wide rate.  See Consol. Pl.'s Br. at 22.

[7] AD duty margins are determined by comparing normal value ("NV") with the price for sales to the United States. To approximate the NV of the subject merchandise in non-market economy ("NME") countries, "Commerce solicits information from respondents concerning the quantities of various inputs consumed in producing the subject merchandise, and then uses surrogate values from a similar, market economy country to value those inputs."  Tianjin Magnesium Int'l Co. v. United States, 533 F. Supp. 2d 1327, 1334 (CIT 2008).

the Coal India, Ltd. ("CIL") data in light of evidence that the Indian government maintains

control over the coal industry and that Indian coal is of an inferior quality than imported coal.

Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. Filed on Behalf of Calgon Carbon

Corp. and Norit Am's Inc. ("Pl.'s Br.") 3, 21.  Calgon requests that the court remand the issue to

Commerce for further explanation of its choice of CIL data or for reversion to the World Trade

Atlas ("WTA") import data used in the <u>Preliminary Results</u>.  <u>Id.</u> at 24.

   In the <u>Preliminary Results</u>, Commerce relied on WTA data to value steam coal

consumed by the respondents.  <u>Preliminary Results</u>, 74 Fed. Reg. at 21,318  19; Def.'s App. Tab

5 at 3  5; Pl.'s App. Tab 15.  In response to Cherishmet's suggestion that Commerce use CIL

data, Calgon placed evidence on the record to demonstrate that domestic coal prices in India were

distorted as a result of intervention by the Indian government.[8]  Pl.'s App. Tab 15.  In the <u>Final</u>

<u>Results</u>, Commerce decided to value steam coal using CIL data, which is grade-specific, for

those respondents who provided precise descriptions of the types of steam coal they consumed.

---

 [8] The relevant evidence comes from the TERI Energy Data Directory and Yearbook 2007
as follows:

> The [coal] sector became captive to the solitary coal company, CIL . . . , a government
> PSU (public sector undertaking) with a very large strongly unionized labour force;
> resulting in a very strong coal lobby negating all proposed reforms in the sector and
> consequently maintaining a status quo. The reforms have hardly touched the sector,
> competition and private participation remain minuscule, and best practices have not been
> adopted.
> . . . .
> Since coal was always a controlled commodity and became the monopoly of a couple of
> government PSUs after nationalization, it has been in short supply. . . . As the possibility
> of the opening up of the sector was resisted by the strong unions, the entry of the private
> sector remained low and resulted in larger shortages as the national coal companies could
> not create enough capacities.

Pl.'s App. Tab 15, at 36  38.

Issues and Decision Memorandum at 35.  Commerce concluded that the evidence placed on the

record by Calgon was insufficient to determine whether or not government intervention in the

Indian coal industry may have affected prices.  Id.  Calgon's claim regarding government

intervention in Indian coal industry amounts to a statement that India with respect to the coal

industry is a de facto NME.  Here, the domestic rate is on the record and Commerce did not find

government subsidization.  Issues and Decision Memorandum at 35.  Even though Commerce

did not articulate precisely why the record did not support Calgon's concerns, it is clear that

Commerce was referring to documents on the administrative record refuting government

subsidization and control.  See id. at 35; App. to Cherishmet Pl.'s Mem. in Supp. of Rule 56.2

Mot. for J. upon the Agency R. ("Intervenor Def.'s App.") Tab 8.  Commerce also addressed

Calgon's concern regarding the quality of Indian steam coal in determining that the type of coal

used by respondents was the same type of coal produced by CIL, based on Useful Heat Value

ranges, grade, and type of coal.  Id.  Because WTA data do not provide this specificity,

Commerce chose CIL data as more accurate, reliable, contemporaneous, and specific.  Id.  Thus,

despite evidence on the record that Indian coal was inferior, Commerce determined that CIL data

matched respondent's input.  Further, despite evidence placed on the record regarding the

distorting effects of government control (which Commerce permissibly found to be

inconclusive), the record as a whole, including the evidence that hte CIL price data pertained to a

type of coal more specific to the input, supported Commerce's ultimate determination that the

CIL data were the "best information available" for the purposes of 19 U.S.C. § 1677b(c)(1).

**B.     Hydrochloric Acid[9]**

**i.      Calgon**

Calgon alleges that Commerce's rejection of WTA data in favor of Chemical Weekly data to value hydrochloric acid ("HCL") failed to give appropriate weight to InfoDrive data, which Calgon claims provides a more precise product description.  Pl.'s Br. at 26.  Calgon asks that Commerce use WTA data in conjunction with the InfoDrive data[10] or average the WTA data with the Chemical Weekly data.  Pl.'s Br. at 26  29.

In the Preliminary Results, Commerce relied on Indian import data from the WTA to value HCL, because WTA data were specific and represented values from the whole of India whereas Chemical Weekly data were derived from selected markets.  Def.'s App. Tab 9 at 7  8.  In the Final Results, Commerce relied on Chemical Weekly data for Jacobi, a company that provided specific purity levels of HCL, because Chemical Weekly data were based on 30  33% purity levels whereas WTA data contained no information on HCL purity, but Commerce continued to rely on WTA data for Cherishmet and CCL, because they had not provided specific purity levels.  Issues and Decision Memorandum at 23  24.  Commerce rejected the use of InfoDrive data to test its chosen data or otherwise, determining that the InfoDrive data on record do not constitute "an adequately high percentage of the corresponding WTA HTS number for HCL for [Commerce] to conclude that the import data are not reflective of comparable HCL" and WTA data report in different quantity units from InfoDrive data.  Id. at 24, 24 n.84.

---

[9] Hydrochloric acid is a raw material used in the acid washing stage of production of the subject merchandise.  Intevenor Def.'s App. Tab 10 at 13.

[10] The Government failed to brief this first claim.  See Def.'s Resp. in Opp. to Pl.'s Mot. for J. Upon the Agency R. ("Def.'s Br.") 22  26.

Although Commerce may not simply discard InfoDrive data on the basis that it did not cover an adequate percentage of imports of the input at issue without first stating at least an approximative of the proportion the data actually cover, see Dorbest Ltd. v. United States, 602 F. Supp. 2d 1287, 1290  91 (CIT 2009), rev'd on other grounds 604 F.3d 1363 (Fed. Cir. 2010), Commerce determined here that Chemical Weekly data were a more precise measure than other data sets for respondents who provided specific HCL purity levels.  Issues and Decision Memorandum at 23  24.  Thus, the court rejects Calgon's request to remand so that Commerce can average Chemical Weekly and WTA data or InfoDrive and WTA data because Commerce's determination that the Chemical Weekly data are superior to other data sets is substantially supported. C.f. Zhejiang Native Produce Animal By-Products Imp. & Exp. Group Corp., et al. v. United States, Slip Op. 09-61, 2009 WL 1726360, at *5 (CIT 2009) (finding that Commerce has the discretion to average equally reliable data sets).

     **ii.**    **Cherishmet**

Cherishmet alleges that Commerce erred by using different data sets for the two respondents' HCL inputs thereby valuing Cherishment's HCL input fourteen times higher than Jacobi's HCL input.  Br. in Supp. of Cherishmet Pl.'s Rule 56.2 Mot. for J. on the Agency R. at 32 ("Intervenor Def.'s Br.").  Cherishmet requests on remand that Commerce apply Chemical Weekly data in valuing Cherishmet's HCL inputs.  Intervenor Def.'s Br. at 36.

In the Preliminary Results, Commerce determined that WTA data provided the best available information for all respondents.  Def.'s App. Tab 9 at 8.  At verification, Jacobi voluntarily, and not in response to a particular request from Commerce, provided supplemental information on HCL purity.  Def.'s App. Tab 6.  Commerce never requested HCL purity data

from Cherishmet nor did Cherishmet provide Commerce with such data.[11]  Def.'s Br. at 24  26.

In the Final Results, Commerce chose to use Chemical Weekly data for Jacobi as it was more

specific based on the HCL purity data Jacobi provided at verification.  Def.'s Br. at 24; Def.'s

App. Tab 5, at Ex. 6.  Commerce used WTA data for Cherishmet because Cherishmet did not

provide purity data.  Issues and Decision Memorandum at 24.  Because Commerce relied upon

Chemical Weekly data for the first time in the Final Results, Cherishmet appended to its brief

before the court a document asserting that its HCL purity levels do not deviate significantly from

those of Jacobi.  Intervenor Def.'s Br. at Attachment 1.  Cherishmet also contends that in a worst

case scenario where Cherishmet theoretically might use HCL of a 100% purity, assuming

relatively similar increases in value as purity increases, such a concentration level would be

valued only three times greater than the concentration level represented by the Chemical Weekly

data, as opposed to the 1400% increase resulting from the use of WTA data.  Intervenor Def.'s

Br. at 36.

        The Government argues that its selection of WTA data is not a de facto adverse

factual inference, but rather an attempt to select the best available information on "a case-by-case

basis."  Def.'s Br. at 25 (citing Lasko Metal Prods, Inc. v. United States, 43 F.3d 1442, 1446

(Fed. Cir. 1994) (permitting Commerce to determine NME surrogate values based on various

methodologies, but not authorizing Commerce to impose different values on respondents for the

same inputs)).  Commerce determined that Chemical Weekly data were superior so long as

respondents supplied HCL purity data.  Issues and Decision Memorandum at 24.  Commerce had

---

[11] In its questionnaire, Commerce did ask for type and grade of material used in the production process.

no obligation to accept additional evidence at verification.  Once Commerce did accept such

evidence, however, Commerce had an obligation to treat Cherishmet fairly by giving it a similar

opportunity.  Commerce's use of Jacobi's but not Cherishmet's purity data led to arbitrary and

unfair treatment of competitors responding to Commerce's inquiries to the best of their abilities.

In essence, Commerce has imposed a de facto adverse facts available rate through the application

of two different surrogate values, triggering a fourteen fold increase in the surrogate value for

Cherishmet.  Thus, the court remands this issue to Commerce to give Cherishmet the opportunity

to place HCL purity data on the record, or reach some other fair result.

### C.    Carbonized Material

Cherishmet alleges Commerce erred in using HTS 2704.00.90: "Other Cokes of

Coal" as Cherishmet's evidence demonstrates that the majority of imports under this tariff

heading are not specific to the inputs used by respondents.  Intervenor Def.'s Br. at 8; Cherishmet

Reply Br. at 4 ("Intervenor Def.'s Reply Br."); Globe Metallurgical, Inc. v. United States, Slip

Op. 08-105, 2008 WL 4417187, at *7 (CIT 2008) (the best available information is that which

better relates to the specific product at issue).  Instead, Cherishmet asks that Commerce use HTS

4402.00.10: "Coconut Shell Charcoal"[12] because "record evidence conclusively established that

coconut-shell charcoal is a carbonized material that can be and is used by the parties to this case

---

[12] HTS 4402.00.10: "Coconut Shell Charcoal" was used by Commerce in the less than
fair value investigation where it commented that coconut shell charcoal is comparable but "not
identical to the coal-based carbonized material used by respondents."  Issues and Decision
Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain
Activated Carbon from the People's Republic of China, A-570-904, Investigation at 59 (Feb. 23,
2007), available at http://ia.ita.doc.gov/frn/summary/prc/E7-3693-1.pdf (last visited Feb. 17,
2011); Pl.'s Br. in Resp. to Cherishmet's Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Resp. to
Cherishmet") 9.

to produce activated carbon."  Intervenor Def.'s Br. at 16.

In the Final Results, Commerce maintained its view from the Preliminary Results that use of the HTS 2704.00.90: "Other Cokes of Coal" was appropriate, despite two pieces of evidence on the record:[13] 1) InfoDrive data covering approximately 50% of "Other Cokes of Coal" imports showing that Indian imports under "Other Cokes of Coal" consisted of low ash metallurgic coal ("LAMC") not carbonized material like that used in producing the subject merchandise and, 2) an expert's report finding that LAMC is commercially unviable and unsuitable for the production of activated carbon.  Issues and Decision Memorandum at 28; Intervenor Def.'s Br. at 6, 13  14.  Commerce relied on three counter assertions: 1) InfoDrive data must cover a significant portion of overall imports in the relevant category, 2) in view of the limited InfoDrive data, 50% of the imports in the selected tariff heading still might be carbonized material, and 3) respondents' expert opinions do not connect the LAMC he tested with LAMC imported under "Other Cokes of Coal."  Issues and Decision Memorandum at 28.

---

[13] In the investigation, Commerce found that carbonized material included both coal and coconut shells, heated and carbonized.  Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the People's Republic of China, A-570-904, Investigation, at 58  60 (Feb. 23, 2007), available at http://ia.ita.doc.gov/frn/summary/prc/E7-3693-1.pdf (last visited Feb. 17, 2011).  In the Preliminary Results, Commerce valued carbonized material under HTS 2704.00.90: "Other Cokes of Coal," explaining the change from the investigation on the basis that "the reported carbonized material was made of various forms of heated bituminous coal, and to a much less extent anthracite coal" and that "this value [was] closer to the reported input than coconut shell charcoal."  Intervenor Def.'s App. Tab 5, at 7.  Cherishmet submitted a contradictory expert's report and InfoDrive data.  Def.'s App. Tab 13, at Ex. 2-1, 3-5.  Jacobi's expert concurred that this tariff heading was "an entirely inappropriate surrogate for the carbon source used in the manufacture of activated carbon."  Intervenor Def.'s App. Tab 7, at Ex. 1; Intervenor Def.'s Br. at 7.  Calgon countered that the tariff heading suggested by Cherishmet, HTS 4402.00.10: "Coconut Shell Charcoal," was "of low value imports and imports which did not accurately reflect the type of charcoal used by respondents in the production of activated carbon."  Def.'s App. Tab 19, at 16.

First, Commerce must consider InfoDrive if it covers a definite and substantial percentage of overall imports.  Globe Metallurgical, Inc. v. United States, Slip Op. 09-37, 2009 WL 1272102, at *3 (CIT 2009); Dorbest Ltd. v. United States, 602 F. Supp. 2d 1287, 1290  91 (CIT 2009) ("Dorbest III") (upholding Commerce's rejection of InfoDrive data where it covered 60% of imports and presented data in different, incommensurable units of measurements); see Longkou Haimeng Mach. Co. v. United States, 581 F. Supp. 2d 1344, 1362 (CIT 2008) (Commerce must address InfoDrive data where it covers 70% of the imports).  Where InfoDrive data is placed on the record to impeach  as opposed to corroborate  Commerce's determination, a lower threshold may exist.[14]  Zhengzhou Harmoni Spice Co. v. United States, 617 F. Supp. 2d 1281, 1325 (CIT 2009) (where respondent is using InfoDrive data to impeach the credibility of Commerce's surrogate value determination, Commerce must cite some evidence supporting its decision).  Here, InfoDrive data cover 50% of the imports and Commerce does not contest that the units of measurement are commensurate.  Thus, Commerce must reassess the InfoDrive data before considering which tariff subheading is appropriate.[15]

Second, assuming the InfoDrive data cover 50% of the imports, Commerce may

---

[14] Commerce found that "the InfoDrive India data . . . [did] not represent 100% of the WTA Indian import data, [and therefore] the Department [could not] determine whether the material tested is similar to the HTS category used to value carbonized material."  Issues and Decision Memorandum at 28.  Cherishmet counters that it need not demonstrate that 100% of the import data under the tariff heading does not correspond to the actual material used.  Intervenor Def.'s Br. at 14  15.  Commerce cannot summarily ignore InfoDrive data on the record merely because those data do not represent 100% of the WTA data..

[15] Commerce also found that "it is not the Department's normal practice to analyze WTA's underlying data within InfoDrive for completeness, given that the InfoDrive data do not account for all of the Indian imports which fall under a particular HTS subheading."  Issues and Decision Memorandum at 28.  Commerce's normal practices and presumptions alone are not substantial evidence.  See FMC Corp. v. United States, 27 CIT 240, 250  51 (2003).

not rely on general statements of assurances that the other half of the data represents the input

being measured.  Taian Ziyang Food Co. v. United States, 637 F. Supp. 2d 1093, 1149  50 (CIT

2009) (where the "vast majority of entries" are products other than the input, Commerce's

statement that, "that fact alone does not undermine the use of the value," falls short of substantial

evidence); Longkou, 581 F. Supp. 2d 1361  63 (finding that where 70% of the imports under a

tariff heading were not related to the subject merchandise Commerce did not provide substantial

support); Zeijiang Dunan Hetian Metal Co. v. United States, 707 F. Supp. 2d 1355, 1364  65

(CIT 2010) (upholding Commerce's findings where it did "not merely dismiss the InfoDrive

India data out of hand, nor . . . make a general finding that InfoDrive data were unreliable," but

assumed the data were reliable and discussed its relevance to WTA data).  Even though

Cherishmet has not clearly shown comparability between the 50% of imports covered by the

InfoDrive data and the remaining 50%,[16] Commerce must show that its selection of this tariff

heading is substantially supported.  Commerce's reliance on Cherishmet's inability to prove that

the remaining 50% "are definitively not a carbonize [sic] material that could be used by

respondents in the production of subject merchandise" does not  support its choice.  Issues and

Decision Memorandum at 28.

       Third, Commerce found that Cherishmet failed to demonstrate that the material

tested by its expert was the same material that would be classified under HTS 2704.00.90: "Other

Cokes of Coal."  Issues and Decision Memorandum at 28.  Cherishmet countered that the expert

---

[16] Cherishmet's brief makes this leap of logic: "[I]t is logical to assume that those entries under this [tariff heading] not identified by InfoDrive India data also consist primarily of LAMC or at least consist of a broad group of products of which LAMC is a significant part."  Intervenor Def.'s Br. at 12  13.

report references a sample that was "typical quality, character and grade" of the LAMC

Cherishmet argues represents virtually all imports under this heading.  Intervenor Def.'s Br. at

15  16.  Commerce cited no evidence contesting Cherishmet's expert's determination that the

LAMC tested was the same as the LAMC imported under the chosen tariff heading.[17]

Commerce must do more than erect roadblocks to respondents' fair arguments.  It

must select the best available information and substantially support its decisions.  Commerce's

determination that imports under the tariff heading constituted the best available information is

not substantially supported because approximately 50% of the imports under this heading are not

product-specific and Commerce's reasons for rejecting data contrary to its selection are flawed.

Thus, the issue is remanded to Commerce to specifically address plaintiffs' argument that

imports under HTS 2704.00.90: "Other Cokes of Coal" are not product-specific and to select the

best method for valuation of the input as possible under the circumstances.  If all the choices are

equally bad, Commerce should explain this and its final choice.

### D.       Bituminous Coal[18]

Cherishmet alleges that Commerce erred when it valued Cherishmet's bituminous

---

[17] Calgon counters that because the expert did not test the incoming imports, Cherishmet cannot prove that the LAMC was the same LAMC referenced in the InfoDrive data.  Pl.'s Br. in Resp. to Cherishmet's Rule 56.2 Mot. for J. on the Agency R. at 14 ("Pl.'s Response Br. to Cherishmet").  Given that Calgon has not submitted its own expert report to the contrary, it seems logical to assume that LAMC tested is the same as the LAMC as imported.  Failing to allow for this assumption would mandate the onerous requirement that all expert opinions be based upon actual imports under the tariff heading during the appropriate year.  This would essentially bar any attempt by a respondent to use expert studies to contest surrogate values based on tariff headings.

[18] Bituminous coal is a raw material used to make carbonized material, an intermediate input in the production of the subject merchandise.  Intervenor Def.'s App., Tab 10 at 12.

coal consumption using WTA import data instead of domestic CIL data.  Intervenor Def.'s Br. at

28.  Cherishmet requests Commerce apply CIL data to value its bituminous coal inputs.[19]

   First, Cherishmet argues that coking coal is used in metallurgical and steel

industries and cannot be used to value bituminous coal.  Intervenor Def.'s Br. at 29  30;

Intervenor Def.'s App. Tab 3.  Commerce must show a rational relationship between the

surrogate value and the input to which it is applied.  Dorbest I, 462 F. Supp. 2d at 1307  08.

Furthermore, Commerce must establish the category of the input used by the respondent or the

categories normally used to produce the subject merchandise.  Hebei Metals & Minerals Imp. &

Exp. v. United States, 366 F. Supp. 2d 1264, 1273 (CIT 2005) ("Hebei II").  Neither in the Final

Results nor in the briefs does Commerce make any argument as to why coking coal is a valid

surrogate for bituminous coal in light of Cherishmet's claims.

   Second, Cherishmet argues that Commerce fails to explain why cheaper domestic

products are not the best available record source.  Intervenor Def.'s Br. at 30; Yantai Oriental

Juice Co. v. United States, 26 CIT 605, 617 (2002) (rejecting Commerce's determination that

more expensive imported coal was a better surrogate than domestic coal because Commerce must

explain the existence of the relationship between surrogate and input).  Commerce failed to

respond to this contention at the administrative level.

   Thus, because of Commerce's failure to explain the relationship between coking

coal and bituminous coal or articulate why a less expensive domestic product would be rejected

for a more expensive imported product, the issue is remanded to Commerce for further

---

[19] The court need not address Cherishmet's procedural argument that Commerce failed to
advise it of deficiencies as to this input.

consideration or explanation.

### E.    Coal Tar

Cherishmet alleges that Commerce erred in adopting as its surrogate value for imports under HTS 2706.00.10: "Coal Tar" because Commerce failed to examine statistical discrepancies between Singaporean export data and Indian import data or investigate the presence of high value U.S. exports.[20]   Intervenor Def.'s Br. at 21  25.   Cherishmet asks that Commerce average Singaporean and Romanian export data or use financial statements from Indian companies to value coal tar as opposed to using Indian HTS 2706.00.10: "Coal Tar" value.   Id. at 19.   In both the Preliminary Results and the Final Results, Commerce relied on HTS 2706.00.10: "Coal Tar."   Issues and Decision Memorandum at 32; Intervenor Def.'s App. Tab 5, at 4.

Cherishmet alleges that Indian import data contain a large percentage of high-value, non-coal tar imports because WTA Indian import data under HTS 2706.00.10 show 40% more imports by kilogram and 400% greater average unit value than WTA Singaporean export data under HTS 2706.00.00 for a similar period.[21]   Intervenor Def.'s Br. at 18, 22; Def.'s App. Tab 17 at 14.   Cherishmet supports this contention with the fact that Indian imports from

---

[20] According to WTA data, only three market economies exported coal tar to India from October 2006 to March 2008.  By weight, Romania exported 12.52% (106,345 kgs), Singapore exported 14.12% (120,000 kgs), and the United States exported 73.36% (623,239 kgs) of total imports from market economies to India.

[21] Calgon counters that Cherishmet's argument is invalid because it relies on the assumption that the data sets are comparable even though they are "nearly" the same time period and "the majority" of Singaporean exports entered India.  Pl.'s Response Br. to Cherishmet at 19. Calgon's argument proves too much.  Although it undoubtedly tempers the strength of Cherishmet's argument, the fact that there is not a perfect statistical overlay does not completely invalidate the argument.

Romania are valued at 8.55 Rs/kg under HTS 2706.00.10.  In contrast, Singaporean exports are

valued at 6.314 Rs/kg while Indian imports for the same period are 23.68 Rs/kg.  Intervenor

Def.'s Br. at 22.  In the Final Results, Commerce disregarded Cherishmet's claim on the basis

that, "[b]y simply arguing that the export quantities versus import quantities predictably differ,

Cherishmet has not established that . . . Singapore[an] export data are more reliable than the

Indian import data."  Issues and Decision Memorandum at 32.  Commerce determined that the

discrepancy did not call into question WTA import data because Commerce did not expect

export and import data to match up at a one-to-one ratio.  Id.  Furthermore, despite Cherishmet's

attempt to explain how data from the tariff heading should be construed to reflect negatively on

data from a tariff subheading, Cherishmet has not placed evidence on the record that directly

calls into question Commerce's choice of surrogate value.  Commerce's value used in the Final

Results, 21.79 Rs/kg, is corroborated by the total Indian imports of coal tar under HTS

2706.00.10, 83% of which had an average unit value of 24-25 Rs/kg.  Pl.'s Response Br. to

Cherishmet at 20.  The sum of the evidence on record does not require the court to upend

Commerce's determination that HTS 2700.00.10 is the best available information.

          Cherishmet also alleges that U.S. export statistics show that no mineral tars

(which encompass coal tar) had been exported to India during the period of review and that

InfoDrive data indicate that the products identified were highly specialized products not used in

production of the subject merchandise.  Intervenor Def.'s Br. at 23.  The InfoDrive data which

Cherishmet proposes show that India imported 15,709 kg of coal tar from the United States

whereas WTA data shows India importing 396,894 kg of coal tar from the United States (4.00%

of the WTA data and 1.85% of total imports).  Issues and Decision Memorandum at 32.

Although InfoDrive data may prove helpful in certain cases, here, Commerce permissibly

declined to use the InfoDrive data on the basis that the InfoDrive data relied upon by Cherishmet

constituted an insignificant percentage of overall imports.  Issues and Decision Memorandum at

32; Dorbest III, 602 F. Supp. 2d at 1290  91 (rejecting InfoDrive data where it composed an

insignificant percentage of overall import data).

       Finally, Cherishmet urges the court to remand to Commerce so that Commerce

may consider using financial statements in lieu of import data.  Intervenor Def.'s Br. at 23  25.

Given the inherent inconsistencies among financial statements, Commerce permissibly chose for

its surrogate value calculation the data set representing the best available, if flawed, information.

Respondent's evidence to the contrary as embodied in tangential tariff headings and insignificant

data sets represents mere conjecture to the contrary.   Commerce's determination is therefore

sustained in this regard.

    **F.**    **Ink**

       Cherishmet alleges Commerce erred in valuing ink used to mark packing bags

under HTS 3215.00: "Ink, Printing, Writing, Drawing etc., Concen. or Not," rather than HTS

3215.90.90: "Other ink not elsewhere specified," because Commerce failed to provide substantial

evidence supporting its decision.  Intervenor Def.'s Br. at 37; Intervenor Def.'s App. Tab 9, at 36.

       In its supplemental questionnaire, Cherishmet stated that, "the ink [it] used to

mark packing bags is not printing ink, fountain pen ink, ball pen ink or other drawing ink.

Rather it is ink classifiable under HTS 32159090."  Def.'s App. Tab 11 at 24.  Cherishmet offers

no further evidence.  In the Final Results, Commerce continued to use HTS 3215.00, finding that

"Cherishmet [had] not provided additional evidence on the record to compel a change from the

Preliminary Results." Issues and Decision Memorandum at 38. Cherishmet offered no evidence

during the review to support its assertion that its ink is not printing ink. NSK Ltd. v. United

States, 919 F. Supp. 442, 449 (CIT 1996) ([R]espondents have the burden of creating an adequate

record to assist Commerce's determinations." (internal quotation marks omitted)). Additionally,

to "mark" is defined as "to label (an article) with a sign or symbol," "brand," or "stamp," and to

"print" is defined as to "mark with a print" or "to cause (as a mark) to be stamped." Webster's

Third New International Dictionary 1383, 1803 (Philip Babcock Gove et al. eds., 1981). Thus,

Cherishmet neither fulfilled its burden nor successfully argued that "print" was distinguishable

from "mark." Commerce's determination on this issue is affirmed.

### G.    Surrogate Labor Value

Cherishmet alleges that Commerce's use of its wage rate regression methodology

does not comport with the statutory requirement to use surrogate values from a country that is

both economically comparable and a significant producer of comparable merchandise.

Intervenor Def.'s Br. at 38 39. Commerce requests a voluntary remand to redetermine the

surrogate value for Cherishmet's labor costs.[22] Def.'s Br. at 37.

The Federal Circuit has concluded that Commerce's wage rate regression

methodology is inconsistent with 19 U.S.C. § 1677b(c)(4). Dorbest, Ltd. v. United States, 604

F.3d 1363, 1372 73 (Fed. Cir. 2010) ("Dorbest IV"). In the Final Results, Commerce relied on

the now invalidated methodology. Issues and Decision Memorandum at 16. Thus, Commerce

---

[22] No party contests the voluntary remand. Pl.'s Response Br. to Cherishmet at 39; Reply
Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Hebei Foreign Trade and
Advertising Corp. ("Consol. Pl.'s Reply Br.") ii; Def.'s Br. at 37.

erred in its use of the methodology and the issue will be remanded to Commerce.[23]  See SKF

USA, Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (permitting the reviewing court

to grant a voluntary remand in its discretion so long as it is not frivolous or in bad faith).

## III.    Combination Rates[24]

Calgon alleges Commerce erred when it failed to apply combination rates because

it impermissibly required combination rates in the investigation but not in this administrative

---

[23] Cherishmet requests a remand to Commerce ordering that the labor wage rate be recalculated using India's labor rate of $0.21 per hour.  Intervenor Def.'s Br. at 40.  Calgon argues that although the Federal Circuit invalidated Commerce's labor wage rate, it did not mandate that the surrogate labor wage rate should be based on a single country.  Pl.'s Response Br. to Cherishmet at 39; see Dorbest IV, 604 F.3d at 1372 (holding Commerce's labor wage rate invalid because it "improperly uses data from both countries that produce comparable merchandise and countries that do not").  Cherishmet asks that the record not be reopened because earlier cases should have warned that Commerce's labor wage rate would be overturned.  Intervenor Def.'s Reply Br. at 12; see, e.g., Allied Pac. Food (Dalian) Co. v. United States, 587 F. Supp. 2d 1330, 1362 (CIT 2008) (holding Commerce's "surrogate labor rates in [NME] investigations and reviews . . . invalid"); Taian Ziyang, 637 F. Supp. 2d at 1136 (finding the regression-based "methodology . . . inconsistent with the statutory mandate").  Given that Commerce did not have a full and fair opportunity to consider this issue at the administrative level, the minor gains to judicial efficiency do not outweigh the court's interest in allowing Commerce to make the initial finding.

[24] To prevent circumvention of high cash deposit rates by firms in NME countries diverting exports through intermediaries with lower rates, Commerce occasionally imposes combination rates, which involve "specific pairs of exporters and producers in situations where a specific producer supplied the merchandise which was then exported by the firm in question during the [period of review]."  Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp. 2d 1322, 1340 (CIT 2010); see 19 C.F.R. § 351.107(c).  In 2005, Commerce stated that for future investigations Commerce would apply a single cash deposit rate to the exporter firm and all producers who supplied the same merchandise during the period of investigation.  See Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (Apr. 5, 2005), available at http://ia.ita.doc.gov/policy/bull05-1.pdf (last visited Feb. 16, 2011) ("Policy Bulletin 05.1").

review.[25]  Pl.'s Br. at 8, 10  13.[26]

        Commerce has a duty to prevent circumvention of AD law and may do so by imposing combination rates.  See Shandong Huarang Gen. Grp. Corp. v. United States, 27 CIT 1568, 1580 (2003); 19 C.F.R. § 351.107(b)(1); Tung Mung v. United States, 354 F.3d 1371, 1381 (Fed. Cir. 2004) (Commerce has the discretion to apply combination rates); Tianjin Magnesium Int'l, 722 F. Supp. 2d at 1340  41 (Commerce generally refrains from issuing combination rates and combination rates "remain[] solely in the discretion of Commerce"); U.S. Magnesium, 2007 WL 1875662, at *4 ("Commerce has 'broad' discretion . . . and is not required to use combination cash deposit rates in administrative reviews").  Here, nothing on the record shows that Commerce was presented with a case of circumvention, or otherwise demonstrates

---

[25] In its Final Results, Commerce makes no mention of combination rates, principally because no party raised the issue at the administrative level.  Commerce likely need not respond to unsupported claims that its policies are being circumvented.  Cf. Fujian Lianfu Forestry Co. v. United States, 638 F. Supp. 2d 1325, 1334 (CIT 2009) (according a voluntary remand to Commerce on the basis that Commerce did not fully explain its reasoning on combination rates); Tianjin Magnesium, 722 F. Supp. 2d at 1341  42 (deferring to Commerce on the implementation of combination rates in administrative reviews).

[26] The Government alleges that Calgon failed to exhausted its administrative remedies because Calgon did not raise the issue of combination rates before the Final Results.  Def.'s Br. at 9  10.  Calgon submitted their combination rate arguments nine days after the Final Results, in response to Commerce's draft instructions which did not "continue to apply the combination rates established in the [investigation]."  Reply Br. of Pls. Calgon Carbon Corp. and Norit Am.'s Inc. at 8 ("Pls.' Reply Br."); App. to Reply Br. of Pls. Calgon Carbon Corp. and Norit Am.'s Inc., Tab 2 ("Pl.'s Reply App.").  Combination rates and other anti-circumvention issues do not become concerns until Commerce issues the final results and therefore the doctrine of exhaustion likely does not apply in this instance.  U.S. Magnesium LLC v. United States, Slip Op. 07-99, 2007 WL 1875662, at *3  4 (CIT 2007); see, e.g., Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1195  97 (2004) (declining to require exhaustion where benchmark not revealed until final determination).  Here, although Calgon could have anticipated and raised the combination rate argument earlier in the proceedings, it did not impermissibly fail to exhaust administrative remedies.

combination rates are mandated.[27]  See Lifestyle Enter., Inc. v. United States, Slip Op. 11-16, at

43 (CIT Feb. 11, 2011).  The court cannot find that Commerce abused its discretion in not using

combination rates.

## IV.    Zeroing[28]

Cherishmet alleges that Commerce's interpretation of 19 U.S.C. § 1677(35)[29] is

unreasonable because it permits calculation of dumping margins without zeroing in

investigations but allows zeroing in administrative reviews.[30]  Intervenor Def.'s Br. at 40.

---

[27] Calgon also alleges that Commerce has an analytical framework in applying combination rates in administrative reviews.  Pl.'s Br. at 14.  According to this framework, Commerce considers, 1) the similarity of export's U.S. sale subject to administrative review and in the previous new shipper review where the combination rate was applied, 2) the exporter's normal business practice in the U.S. market, 3) the exporter's ability to source the subject merchandise it sells from a large pool of suppliers, and 4) the existence of high cash deposit rates for other producers subject to the order and a high "other" rate.  Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain In-Shell Raw Pistachios from Iran, A-507-502, POR 07/01/-2--06/30/03, at 16 (Feb. 7, 2005), available at http://ia.ita.doc.gov/frn/summary/iran/e5-596-1.pdf (last visited Feb. 16, 2011).  Calgon fails to cite to any case  indeed because none exist  using this framework in a case where no record evidence exists of specific producers shifting their exports.  See Def.'s Br. at 15  16.

[28] "Zeroing is a practice in which Commerce gives the sales margins of merchandise sold at or above fair value prices an assumed value of zero. . . . Commerce only takes into account those sales margins of merchandise sold at less than fair value prices to calculate the final weighted-average dumping margin." GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337, 1353 n.15 (CIT 2010) (citations omitted).

[29] Cherishmet cites to 19 U.S.C. § 1677(5) in their brief.  The court assumes this to be a typographical error.  The relevant statutory provision is 19 U.S.C. § 1677(35), the provision cited by Cherishmet at the administrative level.

[30] Cherishmet's argument in their opening brief is strikingly limited, incorrectly citing the relevant statute and raising no case law to support their view.  See Intervenor Def.'s Br. at 40. Cherishmet does not raise the issue again in either response brief.  It is unclear whether Cherishmet continues to support this argument and, if so, on what grounds.  If parties are

(continued...)

Commerce explained that it interprets 19 U.S.C. § 1677(35) "to mean that a dumping margin

exists only when [normal value] is greater than export or constructed export price." Issues and

Decision Memorandum at 5.  This interpretation is reasonable.  Corus Staal BV v. Dep't of

Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (finding zeroing permissible); Timken Co. v.

United States, 354 F.3d 1334, 1341  42 (Fed. Cir. 2004) (finding Commerce's decision not to

zero also permissible).  Commerce did not address the shift from not zeroing under the

investigation to zeroing in the administrative review.  See Issues and Decision Memorandum at

5  6.  At the time of this review, the policy of not zeroing applies only to prospective

investigations and administrative reviews, including administrative reviews commencing after

Commerce announced its elimination of zeroing so long as the investigation pre-dates the change

in policy.  Union Steel v. United States, 645 F. Supp. 2d 1298, 1309 (CIT 2009) (citing Corus

Staal BV v. United States, 502 F.3d 1370, 1374  75 (Fed. Cir. 2007).  Furthermore, the change

from zeroing in the investigation but not zeroing in the administrative review has been found to

be permissible.  Dongbu Steel Co. v. United States, 677 F. Supp. 2d 1353, 1366 (CIT 2010)

(citing Corus Staal BV v. United States, 593 F. Supp. 2d 1373, 1383  84 (CIT 2008) (finding that

Commerce's interpretation of 19 U.S.C. § 1677(35)(A)  (B), prohibiting zeroing in investigations

but not in administrative reviews, not inconsistent or unreasonable).  Thus, Commerce did not err

in its decision to use zeroing in the instant case.

---

[30](...continued)
dropping untenable arguments, they should make this clear.

## CONCLUSION

For all the foregoing reasons, the court remands the matter for Commerce to reexamine Hebei Foreign's separate rate certification, the labor regression methodology, and the surrogate values for hydrochloric acid, carbonized material, and bituminous coal. The parties' motions for judgment on the agency record are otherwise denied.

Commerce shall file its remand determination with the court within forty-five days of this date. Respondent and Petitioner have eleven days thereafter to file objections, and the Government will have seven days thereafter to file its response.


          /s/ Jane A. Restani
           Jane A. Restani
               Judge


Dated: This 17th day of February, 2011.
         New York, New York.